UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

KENNETH E. FAIRLEY,

      Petitioner,

v.                                  Case No.  3:12cv301/RV/CJK

JULIE L. JONES, et al.,

      Respondents.

_____/

ORDER and
AMENDED SECOND REPORT AND RECOMMENDATION

The District Judge recommitted this matter to the undersigned for an evidentiary hearing on the claims raised in petitioner's habeas corpus petition filed under 28 U.S.C. § 2254, and for a revised report and recommendation in light of the federal hearing evidence.  (Doc. 39).  After an evidentiary hearing and careful consideration of the issues raised in the petition, the undersigned issued a Second Report and Recommendation on April 23, 2015, concluding that petitioner is not entitled to federal habeas relief.  (Doc. 88).  This Amended Second Report and Recommendation is submitted following the undersigned's discovery of a typographical error in the original Second Report and Recommendation.[1]  For the

---

[1]On page 46 of the Second Report and Recommendation, there is a typographical error in the fifth full sentence.  The sentence reads: "Having failed to prove that these witnesses were available

sake of clarity, the original Second Report and Recommendation will be vacated and this Amended Second Report and Recommendation will replace the former in full. Although the Amended Second Report and Recommendation does not change the substantive analysis in any way, the parties will be given an opportunity to file objections to this Amended Second Report and Recommendation pursuant to 28 U.S.C. § 636(b).  It remains the opinion of the undersigned that petitioner is not entitled to federal habeas relief.

BACKGROUND AND PROCEDURAL HISTORY

On April 27, 2004, petitioner was indicted for two counts of first degree murder with a firearm (Counts One and Two) and attempted first degree murder with a firearm (Count Three), in the Circuit Court for Escambia County, Florida.   (Doc. 14, Ex. A, pp. 1-3).[2]   The victims of the murders were petitioner's mother and her boyfriend.  (Ex. A, pp. 4-5, 11-12).  The victim of the attempted murder was an Escambia County Sheriff's Deputy (Sims) who arrived at the scene shortly after the murders.  (Ex. A, pp. 7-8).  On July 7, 2005, a jury found petitioner guilty of the lesser included offense of second degree murder with a firearm on Count One, guilty of first degree murder as charged in Count Two and guilty of attempted first degree murder with a firearm as charged in Count Three.  (Ex. A, pp. 98-100).  Petitioner

---

to testify and would have testified as petitioner  hypothesizes, the court is left with petitioner's mere speculation and reliance on hearsay, which is <u>sufficient</u> to satisfy *Strickland*'s deficient performance and prejudice prongs."  (Doc. 88, p. 46) (typographical error underscored).  The word "sufficient" was a typographical error and was intended to read "insufficient."  The undersigned has corrected the error in this Amended Second Report and Recommendation, and has underscored the correction for ease in locating it.

[2]All references to exhibits will be to those provided at Doc. 14, unless otherwise noted.

received a life sentence with a minimum-mandatory sentence of 25 years for the murder of his mother; a consecutive life sentence without the possibility of parole for the murder of the boyfriend; and a sentence of 283.6 months imprisonment (consecutive to the first life sentence) with a minimum-mandatory of 20 years (consecutive to the minimum mandatory on the first life sentence) for the attempted first degree murder of Deputy Sims.  (Ex. A, pp. 128-36).  Petitioner's judgment of conviction and sentences were affirmed on direct appeal on December 1, 2006, without a written opinion. *Fairley v. State*, 944 So. 2d 351 (Fla. 1st DCA 2006) (per curiam) (Table) (copy at Ex. K).  Petitioner's application for state postconviction relief was denied without an evidentiary hearing on July 25, 2011.  (Ex. N, pp. 341-427).  The Florida First District Court of Appeal ("First DCA") summarily affirmed on November 30, 2011, with the mandate issuing December 16, 2011.  *Fairley v. State*, 75 So. 3d 722 (Fla. 1st DCA 2011) (per curiam) (Table) (copy at Ex. P).

Petitioner filed his counseled federal habeas petition on June 19, 2012.  (Doc. 1).  The petition raises five grounds for relief:  (1) trial counsel was ineffective when he was not prepared to take the case to trial and present an insanity defense, (2) trial counsel was ineffective when he failed to subpoena essential insanity defense witnesses (Dr. Francis, Dr. Latricia Coffey, Dr. Kaberi Samanta, Dr. Lawrence Gilgun and Dr. Brett Turner), (3) trial counsel was ineffective when he did not adequately question the defense's only expert witness, Dr. Larson, (4) the state courts were incorrect when they categorized petitioner's ineffective assistance claim as without merit due to petitioner's proposed evidence being cumulative and (5) petitioner was denied his Fifth Amendment right to due process and his Sixth Amendment right to counsel when the trial court denied a continuance and ordered the case to trial.  (Doc.

1, pp. 4-8).

Respondents moved to dismiss the petition as untimely, asserting in the alternative that none of petitioner's grounds warranted federal habeas relief.  (Doc. 32).   As to the merits, respondents argued that the state courts' rejection of petitioner's ineffective assistance claims was consistent with clearly established federal law; that petitioner's procedural challenge to the state postconviction proceeding failed to state a claim on which federal habeas relief may be granted; and that petitioner's claim of trial court error was procedurally defaulted (for petitioner's failure to apprise the state court of the federal constitutional nature of the claim) and even if properly exhausted, without merit because the state court's rejection of the claim was consistent with clearly established federal law.  (Doc. 32).

The undersigned issued a Report and Recommendation on February 6, 2014, ("First Report") recommending that the petition be dismissed with prejudice as untimely and, alternatively, denied on the merits.  (Doc. 35).  On May 28, 2014, the District Judge remanded the matter to the undersigned for a revised report and recommendation on the issues of equitable tolling and the merits after conducting an evidentiary hearing.  The District Judge explained that he had "serious concerns about this case on the present record, and it appears . . . that an evidentiary hearing is required before a definitive ruling can be made."  (Doc. 39, pp. 2-3).  The District Judge explained further:

> As to the merits, it is not clear at this point what the evidence will show.  It is apparent that Fairley's competency [sic] was the issue at his trial and that Dr. Larson (a psychologist who is highly respected by local judges but probably was unknown to the jury) believed Fairley was incompetent [sic] at the time of the offense.  It is possible – depending

on what the testimony would have been – that the testimony from at least one of the several psychiatrists would not have been cumulative to testimony from one psychologist on the insanity defense, and such evidence <u>might</u> have persuaded the jury.  These and all other pertinent issues in the petition and filings must be considered and explored during an evidentiary hearing.

(Doc. 39, pp. 3-4).  Respondents moved for reconsideration of that portion of the order granting an evidentiary hearing on the merits of petitioner's claims.  (Doc. 41). Respondents argued that, in contravention of *Cullen v. Pinholster*, 563 U.S. —, 131 S. Ct. 1388, 1398, 179 L. Ed. 2d 557 (2011), and *Pope v. Sec'y, Fla. Dep't of Corr.*, 752 F.3d 1254 (11th Cir. 2014), the district court ordered an evidentiary hearing to expand the record beyond that which was before the state court, without first determining that the state court had unreasonably determined the facts or that petitioner otherwise satisfied § 2254(d).  (Doc. 41).  The District Judge denied the motion for reconsideration, explaining, in relevant part:  "To be clear:  it appears to me on this record (as presently developed) that the state court may have unreasonably determined the facts."  (Doc. 46, p. 1).  After detailing some of the reasons for this conclusion, the District Judge addressed respondents' contention that an evidentiary hearing was improper because it was based on speculation about what additional evidence might show which cannot be the basis for federal habeas relief or an evidentiary hearing.  (Doc. 41, p. 5).  The District Judge explained:

The only "speculation" in this case as it now stands is about what the record should contain, but does not because the state court did not hold an evidentiary hearing.  The record is obviously incomplete.  It is true, as I specifically stated in my prior order, that I cannot say for certain on this record that a better prepared attorney and testimony from additional experts would have changed the outcome of the trial.  But,

that is not the standard.  The question is not whether the outcome would have definitely — or more likely than not — been different, but, rather, whether there is a "reasonable probability" that it would have been.  See, e.g., Strickland, 466 U.S. at 694.   "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id.

On the record as currently developed, there is ample reason to have serious doubts regarding this case.  It is not speculation to have an undermined confidence in the trial based on the facts we do know.  We know, for example, that the public defender appeared in this capital case on very short notice.  He repeatedly told the trial judge that he was not prepared, had not been able to finish his investigation, had not reviewed the discovery, and had not met with his witnesses.  At trial, he called a single (non medical doctor) expert to substantiate the insanity defense on which the entire case hinged.  On the face of it, it would appear to be futile to put on an insanity defense in a case such as this without the testimony of at least one psychiatrist.  It is not entirely clear at this time why the public defender only called Dr. Larson to testify at trial.  Perhaps there was a legitimate strategic reason, but it appears much more likely that it was just the result of defense counsel's admitted unpreparedness.  That is exactly the sort of question that an evidentiary hearing in state court could have (and should have) answered.

As it appears that the state court unreasonably determined the facts, I am giving Fairley in this court what was denied him in state court:  the opportunity to present evidence during a hearing to support his claim of ineffective assistance of counsel when he was forced to trial in a capital case with an unprepared attorney who failed to call several medical doctors and other mental health professionals to support the opinions of Dr. Larson, the non-medical doctor upon whom the public defender had "bas[ed] the whole case."

This is a very unusual case in that the petitioner went to trial with a clearly unprepared attorney, had an appellate lawyer who took his money but did nothing for him, and all the while he appears to have

been seriously mentally ill and legally incompetent for much of the time
in question.  An evidentiary hearing is warranted.

(Doc. 46, pp. 5-7) (citations omitted) (footnotes omitted).

On September 18, 2014, respondents filed a notice of withdrawal of their
statute of limitations defense, thereby removing equitable tolling as an issue.  (Doc.
72).  The undersigned conducted an evidentiary hearing on November 20, 2014,
addressed to the merits of petitioner's claims.  (Docs. 81, 85).  The parties have
submitted post-hearing memoranda.  (Docs. 86, 87).

## THE DISTRICT COURT'S REVIEW UNDER SECTION 2254(d) MUST BE CONFINED TO THE STATE COURT RECORD

The parties do not dispute that petitioner's ineffective assistance claims
(Grounds 1-3) were adjudicated on the merits in state court (docs. 86, 87).  The
undersigned determined previously that to the extent petitioner's denial of a
continuance claim (Ground 5) was cognizable as a federal constitutional claim (by
being couched in terms of due process and the right to counsel), the claim was
procedurally defaulted because petitioner failed to fairly present the federal
constitutional nature of his claim to the trial and appellate courts (*see* doc. 35, pp. 38-
52).  This Second Report assumes to petitioner's benefit (as an alternative) that
petitioner fairly presented the federal constitutional nature of his denial of a
continuance claim to the state courts, and that it was adjudicated on the merits.

Section 2254(d) of the AEDPA applies to petitioner's habeas petition.  Section
2254(d) provides, in relevant part:

(d)  An application for a writ of habeas corpus on behalf of a
person in custody pursuant to the judgment of a State court shall not be
granted with respect to any claim that was adjudicated on the merits in

State court proceedings unless the adjudication of the claim–

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (2015).

In *Pinholster*, the Supreme Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits," 131 S.Ct. at 1398, and that "evidence introduced in federal court has no bearing on § 2254(d)(1) review." 131 S.Ct. at 1400.

The Eleventh Circuit in *Pope v. Sec'y, Fla. Dep't of Corr.*, 752 F.3d 1254 (11th Cir. 2014), summarized *Pinholster*'s holding:

> In *Pinholster*, the Ninth Circuit had held that a federal court making a § 2254(d) habeas determination could consider additional evidence not presented to the state court. *Pinholster v. Ayers*, 590 F.3d 651, 666 (9th Cir. 2009) (en banc). The Supreme Court reversed. Part II of Justice Thomas's majority opinion explained that § 2254(d) contained "backward-looking language requir[ing] an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time *i.e.*, the record before the state court." *Pinholster*, 131 S. Ct. at 1398. This reading of the text was "compelled by 'the broader context of the statute as a whole,' which demonstrates Congress' intent to channel prisoners' claims first to the state courts." *Id*. at 1398-99 (*quoting Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, 117 S. Ct. 843, 136 L. Ed. 2d 808 (1997)). "It would be contrary to that purpose to allow a petitioner to overcome an adverse state-court decision with new evidence introduced

in a federal habeas court and reviewed by that court in the first instance effectively de novo." *Id*. at 1399.

*Pope* at 1262-63.

*Pinholster* applies not only to claims brought under § 2254(d)(1), but "even more clearly to § 2254(d)(2), which contains an explicit textual restriction to evaluate the state court ruling only 'in light of the evidence presented in the State court proceeding.'" *Landers v. Warden, Attorney Gen. of Ala*., 776 F.3d 1288, 1295 (11th Cir. 2015) (*citing Pinholster*, 131 S. Ct. at 1400 n.7) (collecting cases from other circuits that have held that the *Pinholster* restriction applies to § 2254(d)(2) claims, as well). Thus, "before a habeas petitioner may be entitled to a federal evidentiary hearing on a claim that has been adjudicated by the state court, he must demonstrate a clearly established federal-law error or an unreasonable determination of fact on the part of the state court, based solely on the state court record." *Landers* at 1295; *see Pinholster*, 131 S. Ct. at 1398; *id*. at 1412 (Breyer, J., concurring in part and dissenting in part) ("[W]e cannot say whether an (e) hearing is needed until we know whether the state court, in rejecting Pinholster's claim on the basis presented to that state court, violated (d)."); *Pope*, 752 F.3d at 1263 ("[U]nder *Pinholster*, § 2254(d) must be satisfied before a federal habeas court may consider any § 2254(e)(2) evidence."); *id.* at 1263 n.4 (rejecting petitioner's suggestion that the federal court should consider the federal evidentiary hearing evidence in determining whether he satisfied § 2254(d); explaining that "*Pinholster* commands that we must conduct the § 2254(d) analysis based only on the evidence then available to the state post-conviction court, and not on an evidential foundation developed later and reviewed for the first time in federal court.").

The district court's orders strongly, if not conclusively, suggest that the primary

function of conducting a federal evidentiary hearing on the merits of petitioner's claims was to generate a factual context from which the court would then determine whether the state courts unreasonably determined the facts.  The grant of a federal evidentiary hearing for that purpose, however, would be improvident, because whether a petitioner has satisfied § 2254(d) is a threshold issue the court must decide as a matter of law, based solely on the state court record.  "The federal habeas scheme leaves primary responsibility with the state courts. . . ."  *Woodford v. Visciotti*, 537 U.S 19, 27, 123 S. Ct. 357, 154 L. Ed. 2d 279 (2002).   Accordingly, the *Pinholster* court explained the fallacy of allowing "a petitioner to overcome an adverse state-court decision with new evidence introduced in a federal habeas court and reviewed by that court in the first instance effectively *de novo*."  131 S. Ct. at 1399.

Here, the district court did note, as set out above, that it "appears" the state court unreasonably determined the facts.  The question was not, however, decided as a matter of law[3], and, as respondents persuasively suggest, the issue was reserved for decision until <u>after</u> the evidentiary hearing.  (Doc. 41, p. 2; Doc. 87, p. 3).  This procedure does not accord with the post-*Pinholster* paradigm as applied by the Eleventh Circuit.  *See Pope, supra*; *Landers, supra*.[4]  Indeed, if a federal habeas court can reserve the unreasonable determination issue until after an evidentiary hearing, even where the federal court fervently believes the state courts should have provided

---

[3]The very decision to grant a federal evidentiary hearing must be made as a matter of law, and is subject to *de novo* review in the court of appeals.  *See Ballinger v. Prelsnik*, 709 F. 3d 558, 561 (6th Cir. 2013). *cert. den.* 133 S. Ct. 2866 (2014) ("[T]he question of whether a hearing is permitted in the first instance in a habeas case is a question of law and must be reviewed *de novo, see Cullen v. Pinholster*, ⸺ U.S. ⸺, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011).").

[4]The *Landers* decision issued after the district court ordered an evidentiary hearing.

such a hearing, the review function mandated by § 2254(d) for matters decided on the merits, would be mostly obliterated.  *See Ballinger* 709 F. 3d at 561-62 ("While allowing a petitioner to supplement an otherwise sparse trial court record may be appealing, especially where he diligently sought to do so in state court, the plain language of *Pinholster* and *Harrington* [*v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)] precludes it.").  *Pinholster* certainly offered definitive guidance to a federal trial court engaged in determining a matter under § 2254(d).  In reviewing the case law set out above, one might reasonably conclude that the Supreme Court has recognized that the federal habeas procedure, venerable as it is, tugs a string at the hem of federalism.  Respectfully, the *Pinholster* procedure ensures that the garment will not fall apart.

Accordingly, the undersigned must recommend, after much consideration, that when the district court conducts its final review of petitioner's claims under § 2254(d), it do so based solely on the state court record.  The First Report provides the undersigned's § 2254(d) review of petitioner's ineffective assistance claims based solely on the evidence before the state court.  That analysis will not be repeated here, except to add the following additional observations.

The District Judge expressed a specific concern about petitioner's claim that counsel should have called additional experts, including one or more psychiatrists to testify on the insanity defense.  (*See* Doc. 46, p. 5 ("On the face of it, it would appear to be futile to put on an insanity defense in a case such as this without the testimony of at least one psychiatrist.").   The only proposed expert/psychiatric witnesses identified in petitioner's counseled habeas petition are Drs. Francis, Coffey, Samanta, Gilgun and Turner.   Petitioner identifies Dr. Francis as a psychiatrist who, according

to petitioner, would have testified that petitioner was experiencing command hallucinations when he shot his mother and her boyfriend.  (Doc. 1, pp. 4-5). Petitioner did not expand on Dr. Francis' proposed opinion testimony in his counseled pleadings before this court.  To glean further insight into petitioner's claim, the undersigned re-reviewed petitioner's state postconviction motion.  That motion reveals that petitioner's allegation that defense counsel should have deposed and called Dr. Francis was based on a psychiatric report Dr. Francis prepared <u>after</u> petitioner was tried, convicted and sentenced.  (Doc. 14, Ex. M, p. 198 (petitioner's state postconviction motion identifying the date of Dr. Francis' evaluation as "12-29-06")); *see also* Doc. 27, Ex. N, p. 3 (a psychological evaluation of petitioner's competence to proceed in the state postconviction proceeding prepared by Jamie Barron, Psy. D. dated 8-7-09, which references a bio-psycho-social assessment prepared by Dr. Francis dated 9-1-05, and a psychiatric evaluation dated 12-29-06)). Petitioner's allegation of a proposed witness whose evaluation and opinion did not exist at the time of petitioner's trial cannot serve as the basis for finding counsel deficient for failing to depose or call this witness, as petitioner presents no facts suggesting counsel was aware of, or reasonably could have anticipated, Dr. Francis' proposed report.  "[T]he mere fact a defendant can find, years after the fact, [an] . . . expert who will testify favorably for him does not demonstrate that counsel was ineffective for failing to produce that expert at trial."  *Davis v. Singletary*, 119 F.3d 1471, 1475 (11th Cir. 1997) (counsel was not ineffective for failing to call a mental health expert to testify).  Further, although petitioner's counseled petition represents that Dr. Francis "would have testified that the Defendant was suffering from command hallucinations at the time of the crime" (doc. 1, p. 4), the record establishes

that Dr. Francis was merely relating <u>what petitioner told him</u>, not Francis' own opinion.  (Doc. 27, Ex. N, p. 3 (Dr. Barron's report describing Dr. Francis' bio-psycho-social assessment performed on 9-1-05, and quoting Francis as stating, "'<u>the inmate stated</u> he was experiencing command hallucinations when he shot his mother and her boyfriend, but states that his symptoms are well-controlled by medication.'") (emphasis added)).

The same is true of Dr. Coffey's proposed testimony.  Petitioner's claim relies on a psychiatric evaluation performed by Dr. Coffey on August 24, 2005, <u>after</u> petitioner's trial and sentencing, while petitioner was housed at the Escambia County Jail awaiting transfer to the Florida Department of Corrections. (*See* Doc. 14, Ex. M, p. 197 (petitioner's state postconviction motion identifying the date of Dr. Coffey's evaluation as "8-24-05"); *see also* Doc. 27, Ex. N, p. 2 (Barron report describing Dr. Coffey's evaluation)).  Again, petitioner cannot establish deficient performance based on counsel's failure to discover and use evidence that did not exist at the time of trial.

As to Dr. Samanta who treated petitioner at Lakeview Center during his involuntary civil commitment two months prior to the murders, Dr. Larson's trial testimony included a detailed description of Dr. Samanta's findings, diagnosis and treatment.  As to Dr. Turner, petitioner asserts defense counsel should have called Turner to testify "that Defendant could not be examined as to competency to proceed to trial because he was too psychotic." (Doc. 1, p. 5).  That proposed testimony is inaccurate.  Petitioner <u>was</u> examined by Turner, Larson and Gilgun concerning his competence to proceed to trial, and all three initially found him incompetent.  It was petitioner's <u>sanity at the time of the offenses</u> that could not immediately be evaluated.  With regard to that issue, of the doctors who evaluated petitioner's competence, it

was Dr. Larson who was the first to meet with petitioner after his arrest, thereby providing the most temporally relevant information about petitioner's mental state and behavior following the shootings.  Larson testified at length about petitioner's bizarre behavior during their first meeting and during Larson's subsequent attempts to evaluate him.  Dr. Larson's testimony established that petitioner's psychotic state after the murders was so severe that he could not be evaluated as to his sanity at the time of the crimes.

As to Dr. Gilgun, the state court record demonstrates that Gilgun's opinion of petitioner's sanity at the time of the crimes was less favorable than, and conflicted with, Dr. Larson's opinion.  Dr. Gilgun opined that petitioner was insane at the time he shot his mother and her boyfriend, but sane less than two hours later when he shot at Deputy Sims.  As the state court reasonably determined, it was neither objectively unreasonable nor prejudicial for counsel to decline the risk of presenting an additional expert opinion that conflicted, in part, with the wholly favorable expert testimony of Dr. Larson, especially when counsel knew the State would be offering no expert opinion on the issue of insanity.

As concluded in the First Report, petitioner has not shown that, when measured through the deferential lens of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the state court's fact-finding methods in this case were so deficient as to render its factual determinations unreasonable.  Nor has petitioner shown that no 'fairminded jurist' could agree with the state court's rejection of petitioner's ineffective assistance claims.  *See Harrington* , 131 S. Ct. 770 at786 (holding that habeas relief is precluded "so long as fairminded jurists could disagree on the correctness of the state court's decision." (internal quotation marks omitted)).

Petitioner has not satisfied his "doubly deferential" burden under § 2254(d) to warrant a federal evidentiary hearing or federal habeas relief on his ineffective assistance claims.

The First Report did not review petitioner's denial of a continuance claim under § 2254(d), having found the claim procedurally defaulted. If the district court finds in petitioner's favor that he fairly presented the federal constitutional nature of his claim to the state courts and that the state courts rejected the claim on the merits, the undersigned provides this § 2254(d) analysis of Ground 5.

A.      Clearly Established Federal Law

Denial of a continuance rises to the level of a constitutional violation only if it is so arbitrary as to violate due process. *Morris v. Slappy*, 461 U.S. 1, 11-12, 103 S. Ct. 1610, 75 L. Ed. 2d 610 (1983); *Alderman v. Zant*, 22 F.3d 1541 (11th Cir. 1994). "Not every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel." 461 U.S. at 11 (*citing Chambers v. Maroney*, 399 U.S. 42, 53-54, 90 S. Ct. 1975, 1982-1983, 26 L. Ed. 2d 419 (1970)). "[O]nly an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to assistance of counsel." *Id.*, at 11-12 (*quoting Ungar v. Sarafite*, 376 U.S. 575, 589-90, 84 S. Ct. 841, 11 L. Ed. 2d 921 (1964)); *Hicks v. Wainwright*, 633 F.2d 1146, 1148 (5th Cir. 1981)[5] (in habeas corpus context, "not only must there have been an abuse of discretion but it must have been so

---

[5]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) ( en banc ), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

arbitrary and fundamentally unfair that it violates constitutional principles of due process.") (citations omitted).[6]

To demonstrate that the state court's denial of a continuance violated due process, petitioner must demonstrate "first, that the trial court abused its discretion and, second, that its action rendered the petitioner's trial fundamentally unfair." *Conner v. Bowen*, 842 F.2d 279, 283 (11th Cir. 1988) (citation and footnote omitted). For abuse of discretion, the court looks to the record before the state court when the decision was made and whether the state court should have concluded (based on that record) that the denial of a continuance would probably deny a fair trial. *Id.*; *see also Ungar*, 376 U.S. at 589 ("There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process.  The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.").  To determine whether the trial was fundamentally unfair, the court looks for actual prejudice.  *Conner*, 842 F.2d at 283 (citation and footnote omitted); *see also Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1326 (11th Cir. 2002) ("[T]o establish that a denial of a continuance was reversible error, a defendant must show that the denial caused 'specific substantial prejudice.'" (*quoting United States v. Verderame*, 51 F.3d 249, 251 (11th Cir. 1995))).

B.     Record Before the State Court

The Public Defender was appointed to represent petitioner on April 8, 2004. (Doc. 14, Ex. PD-1, item 5).  On April 20, 2004, Assistant Public Defender Scott

---

[6]In *Hicks*, denial of a continuance to the next day to obtain the testimony of a doctor that the defendant was insane (a doctor who could not testify earlier through no fault of the defendant) "effectively stripped him of any defense he might have had."  *Id*. at 1150.

Tatum ("APD Tatum") appeared by filing a notice that petitioner invoked his constitutional rights.  (Ex. A, pp. 27-28).  APD Tatum immediately retained a licensed psychologist (Dr. Larson) to conduct a psychological evaluation of petitioner to determine his competence to proceed and sanity at the time of the offenses.  (Ex. A, pp. 41-47).  In a report dated April 30, 2004, Dr. Larson found petitioner incompetent to proceed.  (*Id*.).  Larson was unable to offer an opinion as to petitioner's sanity at the time of the offenses due to petitioner's inability and/or unwillingness to assist in Larson's evaluation of that issue.  (*Id*.).  On May 3, 2004, APD Tatum moved to appoint two additional experts (Drs. Gilgun and Turner, both licensed psychologists) to evaluate petitioner's competence to proceed and sanity at the time of the offenses.  (Ex. PD-1, items 37, 38, 40; Ex. A, p. 29).  The court granted the motion (Ex. A, pp. 30-33) and, in late May to early June 2004, Drs. Gilgun and Turner found petitioner incompetent to proceed.  (*See* Dr. Gilgun's report at Ex. A, pp. 34-36 (indicating dates of evaluation as 05/27/04 and 06/01/04 and stamped "Filed" with the trial court on June 22, 2004), and Dr. Turner's report at Ex. A, pp. 37-40 (dated May 24, 2004, and stamped "Filed" with the trial court on July 7, 2004)).  Dr. Gilgun was unable to offer an opinion as to petitioner's sanity at the time of the offenses due to petitioner's psychological state and unwillingness to discuss the offenses.  (Ex. A, p. 36).  Dr. Turner's report did not address the issue of petitioner's sanity.  (*Id*., pp. 37-40).

On July 7, 2004, Mr. Jerry Allred moved to be substituted as petitioner's counsel.  The trial court denied the motion due to petitioner's incompetence.  (Ex. PD-1, item 63).  On July 9, 2004, the trial court entered an order adjudicating petitioner incompetent to proceed and committing him to the Florida Department of

Children and Families ("DCF").  (Ex. A, pp. 48-52).  On July 16, 2004, APD Tatum filed a notice of intent to rely on the defense of insanity.  (Ex. A, p. 53).

In November 2004, DCF notified the trial court, the prosecutor and APD Tatum that petitioner was competent to proceed.  (Ex. A, pp. 54-62).  At a hearing held the following month, the parties stipulated to the competency report.  On December 9, 2004, the trial court found petitioner competent to proceed.  (Ex. B, pp. 151-153). The parties were ordered to appear for docket day on January 5, 2005, and trial was set for January 18, 2005. (Ex. PD-1, items 81-83).  The parties conducted discovery. All discovery materials provided by the State were sent to APD Tatum.  (PD-1; *see also* Ex. D, p. 120 (APD Tatum's representation to the court that he, as opposed to Mr. Allred, had received all of the State's discovery).

During the next six months, APD Tatum represented petitioner at various court hearings where petitioner was present.  On January 5, 2005, the parties appeared for docket day and the trial was reset for March 14, 2005, at APD Tatum's request.  (Ex. PD-1, items 86-92).  On the next docket day, March 2, 2005, the parties appeared and the trial was reset for May 9, 2005, at APD Tatum's request.  (Ex. PD-1, items 96-102).  On March, 31, 2005, APD Tatum appeared for petitioner at a hearing on the State's motion for disclosure of petitioner's mental health records from Lakeview Center.  (Ex. PD-1, items 85-126; Ex. B, pp. 155-162).  On April 27, 2005, the parties appeared for docket day and the trial was reset for July 11, 2005, at APD Tatum's request.  (Ex. PD-1, items 116-121).

On June 8, 2005, APD Tatum filed a motion for continuance due to Dr. Larson's unavailability the week of July 11, 2005. (PD-1, item 127).  The motion for continuance was heard on June 16, 2005.  (PD-1, item 127; Ex. B, pp. 164-172).  The

parties agreed to move the trial date ahead to July 5, 2005, which accommodated Dr. Larson's schedule, and the motion for continuance was denied as having been cured by the rescheduling. (*Id*.). The State moved to appoint Dr. Gilgun as an expert to evaluate petitioner's sanity at the time of the offenses, and the motion was granted. (Ex. A, pp. 63-64; Ex. B, pp. 164-172).

Also in June 2005, APD Tatum arranged for Dr. Larson to conduct another psychological evaluation of petitioner, resulting in a report dated June 24, 2005. (Ex. A, pp. 65-71). Dr. Larson determined petitioner was insane at the time he committed each of the three offenses. (*Id*.). Dr. Larson also determined petitioner was competent to proceed to trial, but expressed concern that petitioner was not sufficiently stabilized to testify relevantly, and recommended a competency hearing on that issue. (*Id*.). APD Tatum filed a notice of incompetency on June 28, 2005, citing his concerns that petitioner may be incompetent to stand trial. (Ex. A, p. 74). That same date, APD Tatum moved for a continuance due to Deputy Sims' failure to appear for his deposition, Dr. Larson's concern over petitioner's ability to testify in his own defense, counsel's own concern about petitioner's competence, and counsel's need for additional time to complete discovery. (Ex. A, pp. 72-73). This was one week before trial.

The parties appeared for jury selection on July 5, 2005, at which time the court heard the motion for continuance. (Ex. D, pp. 4-25). In response to the trial court's inquiry about the availability of the parties' respective experts on the insanity defense, the State disclosed that it was not calling an expert to testify on the issue of insanity, because Dr. Gilgun concluded petitioner was insane. (Ex. D, p. 6). The State asserted that Dr. Gilgun was available that day to evaluate petitioner's

competence to proceed with trial, and that Deputy Sims was available to be deposed that morning, although his trial testimony would be the same as his recorded statement which was provided to APD Tatum a year prior. (*Id*., p. 7). The trial court asked the attorneys their thoughts on holding a competency hearing, picking a jury that day and starting the trial the following week. (*Id*.). Defense counsel responded:

> MR. TATUM [defense counsel]:  Your Honor, . . . Dr. Larson, our expert is going to be out for a couple of weeks beginning July 11, the last information that he gave me. Additional time within the body of the motion would be requested to complete discovery. And what is not in the motion is that – that which has been previously argued, our belief, our good faith belief, that private counsel [Mr. Allred] had been retained and would take this. That matter has been resolved. There's no way that that particular private counsel is going to appear on this case. There's additional discovery to be done. Mr. Fairly deserves effective representation on this, and I don't feel like I'm prepared to proceed, not just in trial but in jury selection.
>
> THE COURT:  Generic reference to additional time to complete discovery is needed – I understand explicitly what's talked about with regard to witness Sims. What else are we talking about here? This case is two years old.
>
> MR. TATUM:  Your Honor, we have some outstanding witnesses, neighbors and other friends of the family, who may be able to provide testimony about Mr. Fairley's condition and behavior prior to the incident themself [sic]. My investigators have sought to make contact with these individuals, but as up to today's date, we don't have returns from them or any responses from them. And based upon communications with the other private counsel who had been working on the case, I believe they would provide relevant testimony towards the defense.

(Ex. D, pp. 9-10). The trial judge reviewed Dr. Larson's June 24, 2005 report, ordered Dr. Gilgun to re-evaluate petitioner for competence, and provided that if Dr.

Gilgun's report justified counsel's concern that petitioner's mental state may have decompensated, a competency hearing would be conducted the following day.  The court ruled that jury selection would proceed as scheduled.  (Ex. D, pp. 11-12).

After a brief recess, the court reconvened for jury selection.  APD Tatum renewed his motion for a continuance and asked the court to hear testimony from petitioner's brother, Albert Fairley, "regarding representation and other issues." (*Id.*, p. 13).  Albert Fairley testified as follows:

> THE WITNESS [Albert Fairley]:  I'm a little confused because I – we had retained a private attorney and then like at the last minute he called me Sunday and said he wasn't on the case.
>
> MR. TATUM:  Was it this Sunday?
>
> THE WITNESS:  Yeah.
>
> MR. TATUM:  Two days ago?
>
> THE WITNESS:  Yeah.  He said he wasn't going to be on the case no more and stuff, that he could legally keep the money, that we had did something.
>
> MR. TATUM:  Do you know what that attorney did for the money you paid him?
>
> THE WITNESS:  Not really.  He say he met with him one or two times and did some stuff with a doctor and got some medical records.  I thought he was actually supposed to appear in court and stuff like that and he didn't.
>
> MR. TATUM:  Based upon your discussion with that attorney – did the family communicate important information about the case to that attorney instead of communicating it to court-appointed counsel?  In other words, did you tell Mr. Allred instead of telling me?

THE WITNESS:  I told him some stuff.  He said he was going to take the case, not really worry about the public defender.  So, yeah, he told me a lot of stuff.  And he ain't did nothing.  He said he was going to step up at the time, then Sunday he called and said he wasn't going to take the case, that he was justified in keeping the money and everything.  If I had a problem, to go to the Florida Bar.  But I told him what was I going to do about my brother's defense now.  He said he would testify as a witness.  I said he was an expensive witness if that was the case, could have got somebody else for a lawyer.  He didn't really do nothing.  He told me to come up here and say what I'm saying and testify about what actually took place.

MR. TATUM:  Has your brother to your knowledge also confided to Jerry Allred about his case?  Has he talked to Mr. Allred about his case?

THE WITNESS:  Yeah.  He talked to him a couple of times.  I think one or two times.  I'm not for sure.  I know he talked to him one time.

MR. TATUM:  And based upon your belief that Mr. Allred would take this matter to trial, your family – you didn't contact my office for any kind of preparation or anything about the trial itself?

THE WITNESS:  Not necessarily.  They contacted me one time through this whole process.

MR. TATUM:  That was probably last year, I believe, when we first got the case; is that right, sir?

THE WITNESS:  Yeah.

(Ex. D, pp. 21-22).  On cross-examination, Albert Fairley admitted he was not present when Mr. Allred met with petitioner.  (*Id*., p. 22).  At APD Tatum's request, petitioner was allowed to present testimony.  (*Id*., p. 23).  Petitioner testified as follows:

MR. TATUM:  Mr. Fairley, you met with Jerry Allred on this case –

THE WITNESS [petitioner]:  Yes, sir.

MR. TATUM:  – several times?

THE WITNESS:  Yes, sir.

MR. TATUM:  Has it been your belief that he's been representing you on this case –

THE WITNESS:  Yes, sir.

MR. TATUM:  – the whole time?

THE WITNESS:  Yes, sir.

MR. TATUM:  Do you understand why he's not here today?

THE WITNESS:  No, sir.

MR. TATUM:  Before today's date, did you still believe that Mr. Allred was going to be your attorney on this case?

THE WITNESS:  Yes, sir.

MR. TATUM:  Did that belief keep you from telling me important details about the case and instead telling Mr. Allred about it?

THE WITNESS:  Yes, sir.

(*Id.*, p. 24).  On cross-examination, the prosecutor asked petitioner, "Did you tell Dr. Gilgun or Dr. Larson the same things that you told Mr. Allred?"  (*Id.*).  Petitioner responded, "I'm not certain, sir."  (*Id.*).  Petitioner stated that he understood that Mr. Allred was not his lawyer anymore and identified Mr. Tatum as his lawyer.  (*Id.*, p. 25).  The court denied the renewed motion for a continuance.  (*Id.*).  The jury was

selected.  (Ex. D, pp. 28-118).  The trial court ordered that trial begin at 11:30 the following morning.  (*Id*., p. 115).

The parties appeared the following morning (July 6, 2005).  The court heard testimony from Dr. Gilgun on the competency issue.  (Ex. B, pp. 180-184).  After considering Dr. Larson's June 24, 2005 report and Dr. Gilgun's testimony, the trial court found petitioner competent to proceed and able to testify relevantly.  APD Tatum's motion for a continuance was denied.  (Ex. B, pp. 174-186; *see also* Larson's Report at Ex. A, pp. 65-71, Gilgun's Report at Ex. A, pp. 102-104).  The court recessed briefly, until 2:00.  After resuming, APD Tatum renewed his request for a continuance:

> MR. TATUM:  Your Honor, for the record, the Defense must voice the same concerns we've been voicing repeatedly since last docket day, based upon . . . the issue of private counsel or believed private counsel by the family of the Defendant working on the case which has hindered this counsel's preparation of the case because all communication and discovery had gone towards that attorney.
>
> Our concern is that he would not receive effective representation given what is essentially a very short time period my office has had to prepare, even though our office had been appointed back April 7th or 8th of last year.
>
> THE COURT:  Now, it's my understanding, from what we've discussed previously, that you have consistently been attorney of record here, that there is another private attorney that some in the family may have thought they were working to retain for the benefit of the defendant, and they were talking to that person, but that you have always been counsel of record.  And any discovery that the State has provided in response to discovery requests has been sent to you, has not been sent to this other person.  Isn't that correct?

MR. TATUM:  All discovery's been sent by the State to me.  I do have a file of what I believe to be complete discovery at this point, with the exception of certain photographs that I've just received.

THE COURT:  Okay.  But the discovery that you were talking about was basically information from the defendant and the defendant's family that might be useful in the defense?

MR. TATUM:  Defense – excuse me, Your Honor.  Yes, defense discovery, witness names, et cetera.  We attempted to – at the last minute, we attempted to follow up on investigation of a witness list or name list provided to us by that private counsel, and as of today – as of yesterday, we haven't been able to complete our investigation, our preparation.

THE COURT:  Okay.  Now, did the family meet with you since yesterday?

MR. TATUM:  Since yesterday?  No, Your Honor.  Because of the late jury selection yesterday, preparation for today – this morning's armed robbery case that I had and then this case, there's been no time for me to meet with either Larson, Gilgun, or the family members.

THE COURT:  Now, you were on board with Larson previously, though, and with Gilgun previously when the initial evaluation was done, the initial determination of incompetency was accomplished, and then the determination that he had been restored to competency, and most recently, the report of Dr. Larson and then the testimony of Dr. Gilgun.  Just so it's clear, I'm trying to make sure I understand what of any of that was this other private attorney involved in at all?

MR. TATUM:  The competency issues?

THE COURT:  Anything having to do with Larson, Gilgun, or the Florida State Hospital psychiatrist.  Are you aware of anything at all that that private attorney had to do with any of that?

MR. TATUM:  That answer for me as well remains unanswered.

THE COURT:  Okay.

MR. TATUM:  We did have meetings with Mr. Allred and the chief assistant in our office to discuss this case.  It's been our belief – or was our belief that there would be a substitution once the issues regarding competency or insanity were resolved.  We received the reports from Dr. Larson, finalized, last week after we moved the court date up because Larson was going to be out of town, and that's when counsel decided that, no, I'm not taking the case – or was definitive about it and returned the calls not substituting in.

THE COURT:  Okay.  I understand your concerns and your position.  I take that to be a reiteration of your earlier request to continue the matter, and I'll deny your request.

(Doc. 14, Ex. D, pp. 119-122).

The evidentiary portion of the trial began, and the State presented its case. (Exs. D-E).  After the State rested, APD Tatum renewed his motion for a continuance "in an abundance of caution, just to make sure that I'm adequately and fully prepared to proceed for our case in chief."  (Ex. E, pp. 211-212).  APD Tatum argued that he did not have a written report from Dr. Gilgun, although he knew what it would say. The court denied the motion, noting that it was postponing the start time of trial the following morning until 9:00 a.m.  (*Id.*, p. 212).  APD Tatum proffered the testimony of a neighbor (Mrs. Lewis) concerning petitioner's bizarre behavior, and statements made by petitioner's mother.  (*Id.*, pp. 215-217).  The testimony was excluded.  (*Id.*, pp. 217-222).[7]  APD Tatum called petitioner's aunt (Mildred Joyner-Cummings), who testified that she had known petitioner, spoken to him and observed his behavior for

---

[7]Petitioner does not challenge this ruling.

several years.  Cummings noticed that petitioner had become withdrawn, was hearing voices, and was taking long walks to clear his head.  The "hearing voices" incident occurred within one week of the April 2004 shootings.  (Ex. E, pp. 224-226).  Trial recessed for the evening.

The following morning APD Tatum called petitioner's wife (Pamela Fairley), who testified that she had been married to petitioner for thirteen years, had two children, and had lived in Akron, Ohio for almost three years.  Ms. Fairley separated from petitioner in November of 2002, because of changes in petitioner's behavior.  Petitioner's behavior started to change in the late 1990's.  Petitioner thought people were following him and that someone had bugged the couple's home in Pensacola.  Petitioner would take apart TVs, VCRs, remote controls and stereos looking for electronic bugs (miniature microphones).  Petitioner thought everyone at work (the Naval Air Station) was against him and that the FBI was spying on him.  Petitioner's bizarre behavior caused problems with the family and caused the couple to move to Birmingham, Alabama.  Petitioner's problems continued in Birmingham.  Petitioner's eating and sleeping habits changed.  Petitioner would be up at all times of the night looking for things and saying people were watching them.  Petitioner got to where he would not speak to Ms. Fairley or go anywhere, but would lock himself away in parts of the house.  Ms. Fairley left petitioner and moved herself and their children to Akron, Ohio.  Petitioner came to visit the children once in Akron, on July 4, 2003.  At that time petitioner's behavior was the same.  To her knowledge, petitioner's behavior did not get any better after July 4, 2003.  (Ex. F, pp. 123-129).

APD Tatum called petitioner's brother, Albert Fairley.  Albert testified that he moved out of their mother's home (the home where petitioner resided with their

mother and her boyfriend (Mr. Baldwin) at the time petitioner killed them) around Christmas of 2003.  Petitioner had lived in the home for the six months preceding the April 7, 2004 murders.   During the time Albert lived there, he noticed bizarre behavior by petitioner.  Petitioner was paranoid, anxious, and thinking people were after him.  Petitioner had taken things apart, including the alarm system in the house, trying to see if electronic bugs were in them.  Petitioner would look around anxiously.  Near the end, petitioner didn't come out much or talk much.  The last time Albert observed bizarre behavior by petitioner was April 1st or 2nd of 2004.  At that time, petitioner was very paranoid and would not talk; he was isolated.  Albert tried to get help for petitioner locally through hospitals, but couldn't get any help because he did not have the necessary money.  Petitioner spent time in Lakeview Center because of his mental health issues, including paranoia.  Petitioner's behavior remained the same even after he was released from Lakeview.  Petitioner was very depressed and angry.  Albert did not see petitioner try to disassemble anything after petitioner was released from Lakeview Center, but only because there wasn't anything left to disassemble. (Ex. F, pp. 130-138).

APD Tatum called Dr. Larson to testify as an expert witness.  (Ex. F, pp. 141-169).  Dr. Larson testified that he was a licensed psychologist in the State of Florida, that he had been practicing for over 22  years, and that the last 15 years of his practice had been devoted in large part to forensic psychology.   Dr. Larson evaluated petitioner eight to ten times.  Dr. Larson described his first meeting with petitioner, which occurred at the Escambia County Jail approximately two weeks after the murders.  Dr. Larson introduced himself to petitioner and explained his purpose in meeting with him.  In response, petitioner "pulled a sheet over his head and acted in

a bizarre manner and essentially wouldn't talk."   Petitioner was wholly uncooperative.  Dr. Larson reviewed the jail's infirmary records, which included records from petitioner's involuntary commitment to Lakeview Center two months prior to the murders.  Larson learned that petitioner had been diagnosed with a psychotic disorder at Lakeview, that he had been prescribed an antipsychotic medication, that he had not returned to Lakeview after his release to obtain his medication or other follow-up care, and that petitioner was not on any medication for his psychosis.  Based on his observations of petitioner and petitioner's mental health records, Larson concluded petitioner was not competent to proceed in his criminal case.

After petitioner's competence was restored and he was returned from Florida State Hospital, Dr. Larson reviewed petitioner's summary and learned that two other evaluators (Drs. Gilgun and Turner) had determined petitioner was suffering from a psychotic disorder, "which means out of contact with reality, meaning, you know, as lay people would say, crazy, that he's completely out of it."  Dr. Larson described the Florida State Hospital summary report as "document[ing] some detail about how [petitioner] was grossly psychotic there, became violent with them.  They had to put him in what we call a 'four-point-restraining chair' where they are strapped down, had injected him with antipsychotic medications, had to do that by court order, had to do it against his will."  Over a period of time and with medication, petitioner improved and was released back to the jail.

In evaluating petitioner's sanity at the time of the offenses, Dr. Larson reviewed the arrest reports, reviewed the transcript of Deputy Sims' recorded statement, interviewed Daniel Fairley, interviewed Albert Fairley, interviewed Pamela

Fairley, read the transcripts of two neighbors' recorded statements (Mr. and Mrs. Lewis), interviewed Mrs. Lewis, and discussed the incident with petitioner.  Dr. Larson also reviewed a full set of the Lakeview Center Crisis Stabilization Unit records from January and February of 2004 (two months prior to the incident), the infirmary records from the Escambia County Jail, and the records from Florida State Hospital.

Larson believed the records from Lakeview Center to be "the most important records he reviewed."  "The reason they are important, from my point of view, is that he was Baker acted there by his mother under an ex-parte order.  In the ex-parte order, she described psychotic behavior of being very paranoid, fearing for her life, of his staying up late all night, pacing back and forth, acting in a bizarre way."  The doctors at Lakeview Center diagnosed petitioner with psychosis.  "He was described as grossly delusional, meaning he stays out of contact with reality.  That means he believed things that just weren't true.  He did not recognize that he had a mental illness."  The doctors at Lakeview Center described petitioner as admitting that he made phone calls to law enforcement and phone calls to the FBI about being bugged; that petitioner felt people were out to get him; that petitioner was very frightened; and that petitioner thought people were trying to kill him.  Petitioner was described in the Lakeview Center report as "delusional, paranoid, and poor contact with reality." Petitioner improved with treatment, which included an antipsychotic medication. Petitioner was released, even though he still showed symptoms of mental illness, because in the treating doctor's opinion, Dr. Samanta, petitioner was no longer an immediate danger to himself or others.  Petitioner was given an appointment to return for follow-up psychiatric treatment and a prescription for antipsychotic mediation, but

he never returned.

Based on all of the reports, evaluations and other sources of information Dr. Larson reviewed, Larson came to the conclusion that petitioner suffered from a psychotic disorder and, because of that disorder, he did now know what he was doing or the consequences or wrongfulness of his actions when he killed his mother and Mr. Baldwin, and shot at Deputy Sims.  Dr. Larson testified: "he  had a delusion that his mother and her live-in had become demons, and that they were part of ths conspiracy to kill him.  So they weren't really his mother anymore and mother's lover anymore, but they were demons, and he needed to kill them because they were demons and they were going to kill him."  Dr. Larson continued:  "When a psychotic disorder is this severe, the person doesn't' really know what he is doing in terms of reality.  Mainly, knowing the consequences.  In this case, he doesn't think he is shooting his mother and her lover, he thinks he is shooting demons.  And so he doesn't think it's wrong because he thinks he is shooting demons.  So with that psychotic reason, we would say he is insane.  He didn't know what he was doing, didn't know the consequences, didn't understand the wrongfulness of the conduct at the time of the incident."  As to petitioner's shooting at Deputy Sims, Dr. Larson testified:

> Mr. Fairley had very poor recall of the incident, and that's not uncommon in psychiatric patients.  Time and time again, psychiatric patients – and most of them don't get in trouble with the law.  They don't just have good recall from what went on in their mental confusion and mental illness.
>
> Mr. Fairley has poor recall for it.  He recalls actually believing they were demons.  He recalls actually shooting his mother first and her lover second.  But he has no recall at all.

Then he thought he was really in interrogation and in jail.  He doesn't recall sitting on the front porch for a long period of time with a gun.  He doesn't recall the shootout with the law enforcement officers.  He doesn't recall being taken to the hospital and treated for a gunshot wound, broken bones, hands, or even being booked at the jail.

But by inference, I do have an opinion that at that time, he was mentally ill to such a degree that he meets the criteria for insanity, and I'll explain why.  He admits, – he had found that when he looked in the mirror, that that reminded him of the Navy and the conspiracy against him, including the FBI was against him.  He sometimes believed there was a connection between the FBI and the police.

He called both the sheriff's department and the FBI to get these bugs out of his place and to have a call for protection and they didn't help.  So in his delusions, they became a corporate intertude [sic] of illusions and persecutions.

So putting the two and two together, I think the most likely scenario is at that time, he believed that they were also part of the plot against him.  They were there to kill him.  So I believe he shot with that delusion in place.

The reasons I say that is there was no – I wouldn't expect him just to pop out of psychosis.  Actually, he is very psychotic shooting his mother and father.  I wouldn't expect after an hour or two or three, after on the steps for 20 minutes or however long, and then to pop out of psychosis, particularly when he was psychotic the entire time at the jail before he was sent to Florida State Hospital.

The Florida State Hospital records document he was psychotic for some time there until he responded to medication.  He was certainly psychotic all the times I tried to see him and the other doctors tried to see him at the Escambia County Jail.  No one saw him in a period of lucidity.  No one saw him when he was anywhere close to his right mind.

So I believe that period of time of psychosis extended a number of months to where he really didn't know what he was doing or the consequences or wrongfulness.

In fact, I learned from him that it was sometime after he had been treated in the hospital before he realized he hadn't shot demons. It was sometime before he realized that he shot his mother and her live-in, and then he became overwhelmed with grief and depression. When that hit, I think – and the time he was released from the [Florida State] hospital, he came back [to] jail and he had so much depression he couldn't talk to me because he realized the crazy, terrible, tragic thing of what happened and he cried through the session.

(Ex. F, pp. 161-169). The defense rested. The State presented two rebuttal lay witnesses – Nurse Dixon and Deputy Fillingim – who testified that petitioner faked unconsciousness at the Baptist trauma center following the shootout with Deputy Sims.[8] (Ex. F, pp. 190-198). The State did not present any expert testimony on the issue of petitioner's sanity at the time of the offenses.

The jury rejected petitioner's insanity defense and, on July 7, 2005, found petitioner guilty of the lesser included offense of second degree murder with a firearm on Count One, guilty of first degree murder as charged in Count Two and guilty of attempted first degree murder with a firearm as charged in Count Three. (Ex. A, pp. 98-100).

B.     Federal Review of State Court Decision

The trial court did not arbitrarily deny a continuance. In considering defense counsel's requests for a continuance, the trial court confirmed that APD Tatum had been the only attorney of record, that Tatum received all of the State's discovery, that

---

[8]Petitioner was shot in the hand.

Tatum was involved in all of the court-appointed experts' psychological evaluations of petitioner (Drs. Larson, Gilgun and Turner) and that Tatum was aware of their opinions. The record further establishes that APD Tatum knew the substance of the information contained in petitioner's prior psychiatric records, including the treating doctors' opinions, because they were detailed in Dr. Larson's June 24, 2005 evaluation which Tatum reviewed. Although petitioner's state postconviction motion argued that a continuance was necessary for the defense to obtain records of petitioner's paranoid behavior at work, defense counsel did not proffer these or any other documents as a basis for his request for a continuance. The trial court did not act arbitrarily, or abuse its discretion, in denying a continuance.

As to prejudice, the record establishes that the defense was able to present a comprehensive insanity defense without a continuance. The jury heard Dr. Larson's opinion, which was not countered by a State expert. Through Dr. Larson, the jury learned of petitioner's history of psychosis, including his involuntary commitment to Lakeview Center just prior to the murders, and the treating psychiatrist's findings, diagnosis and treatment. The jury also learned of petitioner's psychotic state following the murders, including Dr. Larson's explicit description of petitioner's behavior, petitioner's adjudication of incompetence and petitioner's commitment to Florida State Hospital (including treating professionals' findings, diagnosis and treatment there). The defense also presented the testimony of three family members who testified to petitioner's bizarre behavior and symptoms of psychosis in the years and weeks leading up to the shootings.[9] The testimony of petitioner's brother (Albert) was supplemented by Dr. Larson's recounting that Albert told him he moved

---

[9]Tatum also attempted to call a neighbor, but her testimony was excluded.

out of his mother's home three months prior to the murders because petitioner attempted to chop down Albert's bedroom door with an axe.  Petitioner has not shown that no 'fairminded jurist' could agree with the state courts' rejection of petitioner's due process and right to counsel claims arising from the denial of a continuance.  *See Richter*,  131 S. Ct. at 786.

To summarize, because the state courts did not run afoul of § 2254(d) in rejecting petitioner's claims, the district court should rescind its order granting an evidentiary hearing on the merits of petitioner's claims and conclude, as a matter of law, based solely on the record that was before the state courts, that petitioner has not shown the state courts' rejection of his claims was contrary to clearly established federal law, involved an unreasonable application of clearly established federal law, or was based on an unreasonable determination of the facts.

## DE NOVO REVIEW OF PETITIONER'S CLAIMS

Should the District Judge find that petitioner has satisfied his burden under § 2254(d), the following provides a de novo of petitioner's claims in light of the evidence presented at the federal evidentiary hearing.

Petitioner's Claims

| | |
|---|---|
| Ground One | "Trial Counsel Was Ineffective When He Was Not Prepared to Take the Case to Trial And Present an Insanity Defense."  (Doc. 1, p. 4). |
| Ground Two | "Trial Counsel Was Ineffective When He Failed to Subpoena Essential Insanity Defense Witnesses" (Doc. 1, p. 5). |
| Ground Three | "Trial Counsel Was Ineffective When He Did Not Adequately Question The Defense's Only Expert Witness". (Doc. 1, p. 6). |

Ground Four "The State Courts Were Incorrect When they Categorized the Defendant's Claim of Inneffective [sic] Assistance of Counsel As Without Merit Because the Defendant Proposed Presenting Cumulative Evidence." (Doc. 1, p. 7).

Ground Five "The Defendant Was Denied His Fifth Amendment Right To Due Process And Sixth Amendment Right To Counsel When The Trial Court Over Trial Counsel's Objection, Ordered The Case To Trial When Trial Counsel Was Unprepared For Trial." (Doc. 1, p. 8).

In Ground One, petitioner faults trial counsel for failing to " depose or call essential witnesses to the stand." (Doc. 1, p. 4). Petitioner alleges the following in support of this claim:

> One of the expert witnesses, a psychiatrist (M. Francis, MD) was available but not called to the stand would have testified that the Defendant was suffering from command hallucinations at the time of the crime. His available but untaken testimony was not cumulative as the trial court stated in its order denying Defendant's postconviction motion. Dr. Francis' identity was known to defense counsel and Dr. Francis was available for trial. His testimony as to command hallucinations was essential to the Defendant's insanity defense. There was not a substitute witness who could have offered the same testimony.

(*Id.*).

In Ground Two, petitioner faults trial counsel for "fail[ing] to depose and call to trial several expert witnesses." (*Id.*, p. 5). In addition to Dr. Francis, petitioner identifies the following four witnesses and their proposed testimony: (1) Dr. Coffey was available to testify that petitioner was paranoid and delusional prior to the murders, and was also available to testify to petitioner's psychiatric condition while awaiting trial; (2) Dr. Samanta (sometimes referred to by petitioner as "Samanth")

was available to testify that when she examined petitioner three months prior to the murders, petitioner was acutely psychotic, delusional and paranoid; (3) Dr. Gilgun was available to testify that petitioner did not appreciate the wrongfulness of his actions caused by his mental illness; and (4) Dr. Turner was available to testify that petitioner could not be examined as to competency to proceed to trial because he was too psychotic.  (Doc. 1, p. 5).

In Ground Three, petitioner faults trial counsel for failing to "thoroughly flush[ ] out" Dr. Larson's testimony at trial.  Dr. Larson was the only expert witness to testify on the issue of insanity.   Petitioner alleges that a more thorough examination of Dr. Larson would have established that petitioner was in such a delusional state that Dr. Turner could not perform a psychological evaluation on him, and that petitioner's mental disorders had been continuing (thereby "tend[ing] to show a severe disorder and . . . that insanity was not a defense invented for the purpose of trial.").  (Doc .1, p. 6).

In Ground Four, petitioner argues that the state postconviction trial court "was wrong" and the First DCA "incorrect" when they determined petitioner's proposed additional evidence outlined in Grounds One through Three above was cumulative. (Doc. 1, p. 7).  The undersigned construes this claim as one that the state courts unreasonably rejected petitioner's ineffective assistance claims based on the incorrect determination that petitioner's proffered evidence was cumulative. Because this Second Report reviews petitioner's ineffective assistance claims de novo, Ground Four will not be addressed.

In Ground Five, petitioner claims his federal constitutional rights to due process and the effective assistance of counsel were violated when the trial court

denied the defense's motions for a continuance.  Petitioner alleges in support of this claim that his public defender believed private counsel had been retained to represent petitioner at trial; that private counsel was in fact retained by petitioner's family; that private counsel had represented to petitioner's public defender that he would take over the case once petitioner's competency evaluation was completed; that petitioner believed private counsel was representing him as late as the day before trial; that petitioner did not share facts germane to the case with the public defender in the belief that the public defender was not his attorney; that two days before trial private counsel informed petitioner's brother that he would not be proceeding in the matter; and that the public defender was not prepared to put forth an insanity defense.  (Doc. 1, p. 8).

Evidence Adduced at the Federal Evidentiary Hearing

The undersigned conducted an evidentiary hearing on November 20, 2014. Petitioner presented the testimony of Dr. Gilgun.  Dr. Gilgun testified that he is a licensed psychologist in the State of Florida and that his specialty is forensic psychology.  (Doc. 85, p. 7).  Dr. Gilgun clarified that he is a psychologist, not a psychiatrist.  (*Id*., pp. 7-8).  Dr. Gilgun testified that he believed he prepared three reports, but had no record of them because his file had been destroyed due to age. Dr. Gilgun discussed the two reports contained in the state court record:  the 2004 report (*see* Report at Doc. 14, Ex. A, pp. 34-36 (indicating dates of evaluation as 05/27/04 and 06/01/04)); and the 2005 report (*see* Report at Doc. 14, Ex. A, pp. 102-104 (indicating dates of evaluation as 06/27/05 and 07/06/05, containing a facsimile transmission date of July 7, 2005 at 04:54 a.m., and a clerk stamp "Filed" date of July 8, 2005)).  Dr. Gilgun believed there was a third report dated June 26, 2005, that

report having been referenced in the latter 2005 report, but Gilgun had no independent recollection of it and neither Dr. Gilgun, petitioner's counsel, respondent, nor the state court had a copy of it.  (Doc. 85, p. 12).

Dr. Gilgun summarized his 2004 report wherein he found petitioner incompetent to proceed, explaining:  "He was grossly psychotic, very menacing, wouldn't cooperate when asked questions. . . . I told the court I could not offer an opinion on sanity because I couldn't talk to the man about what he did at the time that he was arrested."  (*Id*., p. 9).  Dr. Gilgun also concluded petitioner was not faking his behavior.  (*Id*.).

Dr. Gilgun summarized the latter 2005 report (evaluation dates of 06/27/05 and 07/06/05), and explained his opinion on the issue of petitioner's sanity at the time of the offenses:

> My conclusions [sic] was that he was insane at the time that he shot his mother and the boyfriend because – and my reason was because that he – he had a loss of ability to such a degree that he did not appreciate the wrongfulness of his conduct.  He believed things to be true which were not; namely, that his mother and her boyfriend were possessed by demons and he was trying to rid them of those demons.  At that point he was insane, using a legal definition of the term.  That was my opinion about the mother and the boyfriend.
>
> My opinion was different about the shootout with the police officer.  I stated that I had different opinion, because when I reviewed the arrest report, he initially was compliant with the police officer.  He did what the police officer told him to do:  Put his hands on his head, you know, followed directions.
>
> At some point, the police officer moved towards his cruiser, was somewhat distracted, and the defendant fired on the police officer, and the police officer returned fire and hit the defendant.

He told me nothing about thinking the police officer had demons or anything of that nature, and I felt that he would realize that firing on a police officer after the officer had told him to be compliant, put his hands on his head, get away from his weapon – and he did it. He didn't hesitate. He did it – that he knew at that point he shouldn't be firing a weapon at a police officer. He later changed his mind, and I felt that he realized that was wrong.

So I opined that he was not insane when he fired on the police officer. I opined that he was insane when he fired – when he shot and killed his mother and the boyfriend.

(Doc. 85, pp. 14-15). Dr. Gilgun explained further: "Here's what I think and believe, and that is that there are times when people who are insane have moments of lucidity when they don't act insane, and then there are times when the[y] are insane and act grossly bizarre. Much of this is in the context of their thinking." (*Id*., p. 16).

On cross-examination, Dr. Gilgun testified that he had offered opinion testimony on a defendant's sanity or insanity in 7 to 10 state court trials. (*Id*., p. 19). Dr. Gilgun recalled that in some of those cases the jury convicted the defendant despite Gilgun's testimony that the defendant was insane. (*Id*., p. 20). When asked whether he believed it made a difference to the jury whether the expert testifying on the issue of insanity was a psychiatrist versus a psychologist, Dr. Gilgun responded:

You know, this is conjecture on my part, obviously. I think not. I think the jury listens to the expert, sees how he collects his thoughts, gives his reasoning and his rational[e], and comes to a decision based on that. You know, before you get to talk, you have to be qualified as an expert, and so I think the jury accepts you as an expert. And so I don't think that they give more weight to one versus the other, myself.

(*Id*., p. 21). Dr. Gilgun testified that if he had been called to testify at petitioner's trial, he would have testified that petitioner was insane at the time he shot his mother

and her boyfriend, but sane when he exchanged fire with the police officer.  (*Id.*, pp. 21-22).   Dr. Gilgun acknowledged that had he given the foregoing opinion at petitioner's trial, the jury could have concluded that if petitioner was sane at 7:00 a.m. (the approximate time petitioner shot at Deputy Sims), he was also lucid two hours earlier when he shot his mother.  (*Id.*, p. 22).

Upon questioning by the undersigned, Dr. Gilgun testified that he had frequently experienced the situation where he testified for the defense on the issue of insanity, another expert testified on the same question, and the jury convicted the defendant.  (*Id.*, pp. 25-26).  On re-direct, Dr. Gilgun testified that it was "standard" for several experts to testify on the issue of insanity.  Dr. Gilgun explained:

> Sanity, as you-all are well aware, is not a defense that is brought up frequently, because it's not particularly successful, frankly.  And usually when it is brought up, there's differing opinions.  There's – several different opinions are sought with defense hoping, I believe, that the experts will agree that this man was mentally ill and insane at the time of the offense.

(*Id.*, p. 26).  On re-cross, Dr. Gilgun clarified:

BY MR. MCCOY [for the respondent]:

Q.  You said that you had testified in several trials where there were multiple experts.  Were you including experts for both the prosecution and the defense?

A. [Dr. Gilgun]:  Yes, sir.

Q.  Do you recall any trials where there were [sic] an expert for the defense opining, presumably, that the defendant was insane and the state used no expert testimony?

A.  Was I involved in one like that?

Q.  Yes, sir.

A.  I don't recall being involved in one where there was just one for the defense and not for the prosecution.

Q.  In that instance, there would not be but one expert to raise insanity, and there would be no contradictory state testimony?

A.  Yes.

(*Id.*, p. 27).

Petitioner also presented the testimony of his trial counsel – (former) Assistant Public Defender Scott Tatum.  Attorney Tatum testified that he met with petitioner a few times during the course of his representation.  (*Id.*, p. 31).  During their first meeting, petitioner was in such a poor mental state that Tatum rapidly arranged for Dr. Larson to assess petitioner for competency. (*Id.*, pp. 32-33).  After petitioner was declared incompetent to proceed in 2004 and committed to Florida State Hospital, Attorney Tatum became aware that petitioner's family had hired private counsel Jerry Allred to represent petitioner through trial, and that Allred "was waiting for, I guess, the right time to file his Notice of Appearance or to have results of competency evaluations done . . . so he didn't have to incur any expenses that he'd bill the family." (*Id.*, p. 35).  When Tatum learned of Mr. Allred's involvement, he reported it to the chief assistant in the Public Defender's Office.  (*Id.*).  During petitioner's commitment at Florida State Hospital, Mr. Tatum did not actively prepare the case, explaining:

> Well, there wasn't really a whole lot to be done while Mr. Fairley was in Chattahoochee.  He wasn't cooperative.  I was surprised to find out later that Mr. Fairley's brother and Mr. Allred had discussed other family witnesses.  If I had that information, that's what I could have

> done.  But during the pendency of time that Mr. Fairley was committed
> to Florida State Hospital, I don't believe myself or anybody in the public
> defender's office did anything to prepare his case for trial.

(*Id*., p. 36).   After petitioner regained competence, Mr. Tatum "had conversations
with Mr. Allred to try to get him pinned down to when he was going to take this, and
we had several conversations," but Tatum did not note any particulars concerning the
timing or substance of those conversations in his file.   (*Id*., p. 37).   In Mr. Tatum's
meetings with petitioner and follow-up conversations with petitioner's brother Albert,
the two indicated they believed Mr. Allred was petitioner's attorney.   (*Id*.).   When
asked about his motions for a continuance and what matters Tatum would have
investigated had he had more time, Tatum responded he would have:  (1) investigated
documents related to petitioner's difficulty with the Navy and his complaints of a
conspiracy to oust him from his job with the Navy (*id*.); (2) obtained records from the
doctors who previously treated petitioner for mental illness (*id*., pp. 37-38); (3) had
his investigator interview additional family members who were familiar with
petitioner's behavior around the time of the offenses and immediately preceding (*id*.,
p. 39); and (4) deposed some law enforcement personnel involved with the crime
scene, and the state medical examiner (*id*. p. 40).   APD Tatum testified with regard
to Dr. Gilgun's report in late June/early July 2005, that Tatum did not have a copy of
Gilgun's report at the time of trial, but he knew Gilgun's opinion on the issue of
sanity despite not having a written report.   (*Id*., p. 44; *see also id*., p. 62).   Thus,
although Dr. Gilgun's written report was not filed in the trial court record until July
8, 2005 (the day after trial concluded), APD Tatum was aware of his opinion:

> The most pressing matter was whether or not he [petitioner] was
> competent to proceed.  I did have information from Dr. Gilgun, and I
> don't know whether it was from this report or an earlier examination,

regarding periods of insanity.  And we were relying on an insanity defense.  Larson was our main witness.  But I had some issues or some reservations about Dr. Gilgun's opinion regarding sanity across the whole timeline of the offense.

. . . .

Dr. Gilgun agreed with Dr. Larson that at the time of the killing of Ms. Fairl[e]y and Mr. Baldwin that Mr. Fairley was insane at the time of the offense.

At the time that Deputy Derrick Sims arrived on scene and Mr. Fairley took a shot at him with the same shotgun, Dr. Larson believed that he was still insane at that time.  Dr. Gilgun – I believe Dr. Gilgun's opinion was that he was not insane at that time.

The concern that I would have is that having the jury completely discount Dr. Larson's opinion, even though Dr. Gilgun would agree with him regarding the insanity on the first two killings, given Dr. Gilgun's opinion that Mr. Fairley was not insane at the time of the third shooting.

(*Id.*, pp. 45-46).  Attorney Tatum explained further:

I put most of my eggs in Dr. Larson's basket, and to try to maintain the doctor's credibility, I didn't' want to put anything inconsistent on.  I didn't want to run the risk of the jury discounting everything, being confused as to some or part of it, the insanity defense itself.  I just made the decision not to put – not to call Dr. Gilgun, given his opinion regarding deputy Sims, that portion of the episode.

(*Id.*, p. 48).  When asked whether he thought additional expert opinions on the issue of insanity would have been excluded as cumulative, Mr. Tatum testified that the cumulative evidence rule was not a factor in his decision.  The reason he did not seek additional opinions was because "it's also possible that you get an extra psychologist and they back up and say that he wasn't insane at the time [of the] first two murders.

I was going to leave that dog alone.  I felt I had enough with Dr. Larson."  (*Id*., p. 49; *see also id.*, p. 59).

When asked about the two prosecution rebuttal witnesses (Nurse Dixon and Deputy Fillingim) who testified that petitioner was feigning unconsciousness when he was brought to the hospital after the shootings, Attorney Tatum testified that he did not believe they damaged the insanity defense. (*Id*., p. 51).  Tatum explained that the reason he did not call Dr. Gilgun to rebut Dixon's and Fillingim's testimony is because Gilgun's statement in his 2004 report that he did not believe petitioner was "faking", related to whether petitioner was faking the angry and paranoid behavior Gilgun observed during his meetings with petitioner, not whether petitioner was faking unconsciousness at the hospital.  Gilgun was not present in the trauma room at the hospital, and the prosecutor would have made that point.  (*Id*., pp. 60-61).

On cross-examination, Attorney Tatum affirmed that he made a strategic decision not to call Dr. Gilgun because Gilgun's opinion – that petitioner was insane at the time he killed his mother and her boyfriend, but sane less than two hours later when he shot at Deputy Sims – made Tatum fear that Gilgun's opinion would open the door for the jury to conclude petitioner was sane the whole time.  (*Id*., pp. 55-56).  Tatum knew going in to trial that the State was not calling an expert to testify on the issue of insanity.  (*Id*., p. 56).  Tatum chose to rely exclusively on Larson due to Larson's opinion that petitioner was insane at the time of all three shootings.  (*Id*.).  Attorney Tatum reviewed his decision with the chief assistant and other senior attorneys at the Public Defender's Office, and no one second-guessed or expressed concern about Tatum's decision to rely exclusively on Larson.  (*Id*., p. 59).

Petitioner testified at the federal evidentiary hearing.  (*Id*., pp. 75-79).  Because

the undersigned does not find petitioner's testimony helpful in establishing any of his claims, the testimony will be not described here but is available in the transcript.

Discussion

This court provided petitioner what he did not receive in state court – an evidentiary hearing on his claims that counsel was ineffective for failing to call Dr. Francis, Dr. Coffey, Dr. Samanta, Dr. Gilgun and Dr Turner, and for failing to adequately question Dr. Larson.   It is petitioner's burden to prove that Attorney Tatum's conduct was objectively unreasonable and that had Tatum acted as petitioner says he should have, there is a reasonable probability the result of his trial would have been different.

"Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative."  *Buckelew v. United* States, 575 F.2d 515, 521 (5th Cir. 1978) (citations omitted).   "[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or an affidavit.   A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim." *United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991) (footnotes omitted).   Petitioner's only witnesses at the federal evidentiary hearing were Dr. Gilgun, Attorney Tatum and petitioner.   Petitioner did not call Dr. Francis, Dr. Coffey, Dr. Samanta or Dr. Turner to testify.   Thus, despite being given the opportunity to prove that counsel was ineffective for failing to call Drs. Francis, Coffey, Samanta and Turner, petitioner failed to affirmatively establish what their actual testimony would have been.   Having failed to prove that these witnesses were

available to testify and would have testified as petitioner hypothesizes, the court is left with petitioner's mere speculation and reliance on hearsay, which is <u>insufficient</u> to satisfy *Strickland*'s deficient performance and prejudice prongs.  *See, e.g., Gaedtke v. McNeil*, 612 F. Supp. 2d 1209, 1230 (M.D. Fla. 2009) (holding that petitioner's failure at federal habeas evidentiary hearing to tender affidavit or other evidentiary showing of the witnesses who might have been favorable to him precluded relief on his ineffective assistance claim).  This conclusion is bolstered by the additional analysis provided above as to each of these proposed expert witnesses.

As to Dr. Gilgun, the record establishes that Attorney Tatum made a reasoned strategic decision, in consultation with his supervisor and other senior attorneys in his office, not to call Dr. Gilgun to testify.  Petitioner has not demonstrated that Tatum's performance fell outside the bounds of reasonable professional judgment.  *See Dorsey v. Chapman*, 262 F.3d 1181, 1186 (11th Cir. 2001) (rejecting petitioner's claim that trial counsel was ineffective for failing to call a particular doctor as an expert witness; "[T]rial counsel's decision to not call the expert witness was not so patently unreasonable a strategic decision that no competent attorney would have chosen this strategy."); *see also e.g., Chaney v. Sec'y, Fla. Dep't of Corr.*, 447 F. App'x 68, 70 (11th Cir. 2011) ("Which witnesses if any, to call, and when to call them, is the epitome of a strategic decision" that seldom, if ever, serves as grounds to find counsel's assistance ineffective." (*quoting Conklin v. Schofield*, 366 F.3d 1191, 1204 (11th Cir. 2004)).  Had Tatum presented Dr. Gilgun's split opinion, defense counsel would have risked undermining Dr. Larson's opinion that petitioner was legally insane throughout the entire criminal episode.  Petitioner also fails to establish a reasonable probability the jury would not have rejected his insanity defense had

Tatum called Dr. Gilgun to testify on direct or rebuttal.[10]

Petitioner is not entitled to federal habeas relief on Grounds One and Two of his petition.

In Ground Three, petitioner faults trial counsel for failing to "thoroughly flush[] out" Dr. Larson's testimony. (Doc. 1, p. 6). Petitioner asserts counsel should have questioned Dr. Larson more thoroughly on the fact that Dr. Turner could not perform a sanity evaluation of petitioner because petitioner was in such a poor mental state, and that counsel should have questioned Dr. Larson more on petitioner's history of mental disorder. (*Id*.). At the federal evidentiary hearing, petitioner did not question Attorney Tatum on these alleged deficiencies. As discussed above, the trial transcript establishes that Dr. Larson testified at length to petitioner's psychiatric history before the murders and petitioner's psychotic behavior after his arrest. (Doc. 14, Ex. F, pp. 141-169). On this record, petitioner has not shown that Tatum's examination of Dr. Larson was so incompetent that no reasonable attorney would have performed in that manner, or that petitioner was prejudiced by Tatum's examination. Petitioner is not entitled to federal habeas relief on Ground Three.

Petitioner's final claim, Ground Five, asserts that the trial court violated petitioner's rights to due process and the effective assistance of counsel when the court denied defense counsel's repeated requests for a continuance. The record

---

[10]Again, as to petitioner's assertion that Tatum should have called Dr. Gilgun to rebut the State's witnesses' testimony that petitioner was faking unconsciousness when he was brought to the hospital immediately following the murders, Attorney Tatum testified: "Well, as I read [Dr. Gilgun's initial competency evaluation] and understand it, . . . Dr. Gilgun's opinion that he wasn't faking it [referred to] the time of Dr. Gilgun's evaluation. I have no doubt if I asked – if I called Dr. Gilgun and asked him that question [whether petitioner was faking it at the hospital], I'm sure Mr. Rimmer would have come right back and brought up the issue, Dr. Gilgun, was he there in the Baptist trauma room or anything like that."

establishes that the trial court did not arbitrarily deny a continuance. The court thoughtfully exercised its discretion after considering all relevant factors.

As to prejudice, the record establishes that Tatum's failure to call Dr. Gilgun was not due to inadequate time to prepare, but to counsel's reasoned strategic decision. The record further establishes that Tatum called three family members to testify to petitioner's bizarre behavior and symptoms of psychosis in the years and weeks leading up to the shootings.[11] At the federal evidentiary hearing, petitioner did not present any testimony from any uncalled family members or other lay witnesses. Petitioner has not shown (1) that any uncalled lay witness was available to testify, (2) what the testimony would have been, (3) that the testimony would have been admissible, or (4) that the defense was substantially prejudiced by the lack of testimony. Although Attorney Tatum testified at the federal hearing that he would like to have had additional documents, counsel did not testify that he would have used any particular documents at trial, or that his presentation of petitioner's insanity defense was substantially hindered by not having them. Petitioner had the opportunity at the federal evidentiary hearing to present his proposed documents to Attorney Tatum to establish whether and how they would have helped Tatum present the insanity defense. Petitioner made no such showing. Again, Dr. Larson testified to the substance of these documents when describing the factors underlying his opinion that petitioner was insane at the time he committed the offenses. The trial court's denial of a continuance did not violate petitioner's right to due process or his right to the effective assistance of counsel. Petitioner is not entitled of federal habeas relief on Ground Five.

---

[11]Tatum also attempted to call a neighbor, but her testimony was excluded.

CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides: "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  If a certificate is issued, "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  Rule 11(b), Rules Governing Section 2254 Cases.

The petitioner in this case fails to make a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483-84, 120 S. Ct. 1595, 1603-04, 146 L. Ed. 2d 542 (2000) (explaining the meaning of this term) (citation omitted).  Therefore, the court should deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Rule 11(a), Rules Governing Section 2254 Cases.  If there is an objection to this recommendation by either party, that party may bring such argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is ORDERED:

The original Second Report and Recommendation (doc. 88) is VACATED, and this Amended Second Report and Recommendation replaces the former in full.

And it is respectfully RECOMMENDED:

1.  That the petition for writ of habeas corpus (doc. 1), challenging petitioner's

judgment of conviction and sentence in *State of Florida v. Kenneth E. Fairley* in the Circuit Court for Escambia County, Florida, Case No. 2004-CF-1577, be DENIED.

  2. That the clerk be directed to close the file.

  3. That a certificate of appealability be DENIED.

  At Pensacola, Florida this 1st day of May, 2015.


       */s/ Charles J. Kahn, Jr.*

       **CHARLES J. KAHN, JR.**
       **UNITED STATES MAGISTRATE JUDGE**


<u>NOTICE TO THE PARTIES</u>

Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).